UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CV Case No. 06 5756

------------------------------------------x

NEMET CHEVROLET LTD. and THOMAS
NEMET, d/b/a NEMET MOTORS,

                          Plaintiffs,

   -against-

CONSUMERAFFAIRS.COM, INC.,

                        Defendant.

**COMPLAINT WITH CLERK'S OFFICE**

FILED
U.S. DISTRICT COURT E.D.N.Y.
★ OCT 25 2006 ★
BROOKLYN OFFICE

GLASSER

GOLD, M.J.

------------------------------------------x

      Plaintiffs, by their attorneys, BRAND, GLICK & BRAND, P.C., complaining

of the defendant herein, respectfully sets forth and alleges, upon information

and belief, as follows:

### PRELIMINARY STATEMENT

1.    Plaintiffs institute this action for monetary relief based upon
defendant's violations of section 43(a)of the Lanham Act, 15 U.S.C. §
1125(a), and New York General Business Law §§ 349(a) and 350, and for
defamation and unjust enrichment. Plaintiffs further bring this action
to secure preliminary and permanent injunctive relief pursuant to section
34(a) of the Lanham Act, 15 U.S.C. § 1116(a).

### JURISDICTION AND VENUE

2.    The jurisdiction of this Court is invoked pursuant to 15 U.S.C. § 1121(a)
and 28 U.S.C. §§ 1331 and 1338(a). This Court further has supplemental
jurisdiction over the state law causes of action pursuant to 28 U.S.C.
§ 1367(a).

3.    The venue of this Court is proper pursuant to 28 U.S.C. § 1391(b)(2) and
(c).

## BACKGROUND

10. Since at least January 20, 2000, defendant has published over the World Wide Web multiple unverified complaints critical to plaintiffs' business resulting in irreparable and continuous damage to plaintiffs.

## COUNT ONE

### DEFENDANT'S VIOLATION OF SECTION 43(a)(1)(A) OF THE LANHAM ACT

11. Plaintiffs repeat, reiterate and reallege each and every allegation contained in those paragraphs on the Complaint heretofore marked and designated "1" through "9" inclusive, with the same force and effect as if herein set forth.

12. Defendant operates in commerce under the guise of "consumer affairs" for the purpose of unlawfully diverting consumers and deriving a profit from misdirecting said consumers.

13. Defendant's practices of using in commerce the name "consumer affairs" cause or are likely to cause confusion, to cause mistake, or to deceive as to its affiliation, connection, or association with a State or Federal organization. Furthermore, defendant's practices of using in commerce the name "consumer affairs" cause or are likely to cause confusion, to cause mistake, or to deceive as to the origin, sponsorship, or approval of defendant's services or commercial activities.

14. As a result of the foregoing, plaintiffs believe that they are or are likely to be damaged by such acts.

15. Therefore, defendant's acts or practices, as set out above, are confusing, deceptive, or misleading and violate section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

## COUNT TWO

### DEFENDANT'S VIOLATION OF SECTION 43(a)(1)(B) OF THE LANHAM ACT

16.  Plaintiffs repeat, reiterate and reallege each and every allegation contained in those paragraphs on the Complaint heretofore marked and designated "1" through "14" inclusive, with the same force and effect as if herein set forth.

17.  Defendant's practices of using in commercial advertising or promotion the name "consumer affairs" misrepresent or are likely to misrepresent the nature, characteristics, or quality of its services or commercial activities.

18.  As a result of the foregoing, plaintiffs believe that it is or is likely to be damaged by the misrepresentation.

19.  Therefore, defendant's acts or practices, as set out above, are confusing, deceptive, or misleading and violate section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

## COUNT THREE

### DEFENDANT'S VIOLATION OF SECTION 349(a) OF NEW YORK GENERAL BUSINESS LAW

20.  Plaintiffs repeat, reiterate and reallege each and every allegation contained in those paragraphs on the Complaint heretofore marked and designated "1" through "18" inclusive, with the same force and effect as if herein set forth.

21.  Defendant's practices of using the name "consumer affairs" in the conduct of its business, trade or commerce deceive or are likely to deceive or mislead consumers.

22.  As a result of the foregoing, defendant's deceptive acts or practices caused or are likely to cause plaintiffs damages.

23. Therefore, defendant's acts or practices, as set out above, are confusing, deceptive, or misleading and violate New York General Business Law §§ 349(a).

## COUNT FOUR

### DEFENDANT'S VIOLATION OF SECTION 350 OF NEW YORK GENERAL BUSINESS LAW

24. Plaintiffs repeat, reiterate and reallege each and every allegation contained in those paragraphs on the Complaint heretofore marked and designated "1" through "22" inclusive, with the same force and effect as if herein set forth.

25. Defendant's practices of advertising under the name "consumer affairs" in the conduct of its business, trade or commerce deceive or are likely to deceive or mislead consumers.

26. As a result of the foregoing, defendant's deceptive acts or practices caused or are likely to cause plaintiffs damages.

27. Therefore, defendant's acts or practices, as set out above, are confusing, deceptive, or misleading and violate New York General Business Law §§ 350.

## COUNT FIVE

### UNJUST ENRICHMENT

28. Plaintiffs repeat, reiterate and reallege each and every allegation contained in those paragraphs on the Complaint heretofore marked and designated "1" through "26" inclusive, with the same force and effect as if herein set forth.

29. If defendant is permitted to retain the sums obtained as a result of its violations of section 43(a) of the Lanham Act, and New York General

Business Law §§ 349(a) and 350, it would be unjustly enriched and plaintiffs will be denied just compensation.

**COUNT SIX**

**DEFAMATION**

30. Plaintiffs repeat, reiterate and reallege each and every allegation contained in those paragraphs on the Complaint heretofore marked and designated "1" through "28" inclusive, with the same force and effect as if herein set forth.

31. Upon information and belief, at all the times hereinafter mentioned, defendant was the owner of certain articles published and appearing on the website consumeraffairs.com, as hereinafter set forth.

32. On or about the 20th day of January, 2000, and continuing to date, the defendant published and disseminated on the website consumeraffairs.com, and, upon information and belief, the defendant participated in the preparation and publication of a false, defamatory, malicious, and libelous article of and concerning the plaintiffs, which article contains inter alia the following matter, to wit:

Robin of Brooklyn (1/20/00):

My father financed a car on 12/30/99 and passed away on 1/1/2000. The dealer doesn't want to give back the down payment or partial. They want my mother to sell them the car back at book value. My mother is retired and on a fixed income and can not afford to pay for this car. My mother and I are suffering from emotioal distress. On top of my father's sudden death, we have to deal with a insensative, uncaring

dealership.

33. On or about the 9th day of October, 2000, and continuing to date, the defendant published and disseminated on the website consumeraffairs.com, and, upon information and belief, the defendant participated in the preparation and publication of a false, defamatory, malicious, and libelous article of and concerning the plaintiffs, which article contains inter alia the following matter, to wit:

Alice of Brooklyn (10/9/00):

We turned a leased vehicle into Nemet when we leased a jeep from them. We had a balance of $4072.00 left on our lease including the mileage overage. The dealer told us we were approved and that they would take care of the above amount. Once we obtained the jeep, we learned three months later that they only paid out the payout amount to the bank.

As a result of their behavior(they never told us they would only pay the buyout amount), we now have to pay for the Jeep we leased plus the mileage overage to Chase Auto Finance. Instead of paying one lease payment as we were led to believe, we are paying two. Had the dealer been honest with us, we would have waited until we settled the old car before contracting for the new one. When we confronted them, they said that it is the normal course of doing business, however, the Honda dealer down the street from their location, informed us that it is not the normal manner of doing business.

34. On or about the 19th day of March, 2002, and continuing to date, the defendant published and disseminated on the website consumeraffairs.com,

and, upon information and belief, the defendant participated in the preparation and publication of a false, defamatory, malicious, and libelous article of and concerning the plaintiffs, which article contains inter alia the following matter, to wit:

Michelle of Westbury NY (3/19/02):

I went to look for a new car. I started with one salesman, by the time I left that day I dealt with 3 different people. I found a 2002 with the list price of $11,487.00. I didn't want to go that high so Ana Lopez and Igal Stark said they would give me the car for $10,075.00. It was written up on an order sheet and I signed it.

The next day I had to go in and sign more papers which I was told were the same papers except these were printed up on the computer. I was lied to. They were the same papers but the price was $2000.00 higher. Being I was a young female buying a new car for the first time I feel I might have been taken advantage of. When I brought the papers back to the dealer the finance manager (JOE) said even though I had the papers with the price of $10,075 it didn't matter because he didn't approve it. He said no one was authorized to quote me with that price.

I am now sitting with a car which I was charged $11,995.00 when the sticker price was only $11,487.00. There isn't anyone from NEMET MOTORS that will do anything to help me. They don't even want to be bothered when I call or go there. I spoke to the saleswoman Ana and she said I should have only gotten

charged $10,075.00 plus tax and APR charges. She is the only one who is willing to help me but she doesn't have the authority to change the papers.

I have been back and forth to the dealership 3 times in the past 4 days and I just think this company is rediculous. One person quotes you one price and once you agree to it they push you off to someone else. I just don't think it was right.

35. On or about the 10th day of June, 2002, and continuing to date, the defendant published and disseminated on the website consumeraffairs.com, and, upon information and belief, the defendant participated in the preparation and publication of a false, defamatory, malicious, and libelous article of and concerning the plaintiffs, which article contains inter alia the following matter, to wit:

Chantal of West Hempstead NY (6/10/02):

I have a judgment against this dealership for $983. I received this award in January 2001 and have not been able to collect. When I purchased A 2001 Chevrolet Cavalier on August 30, 2000, the dealership would not install a sunroof prior to delivery of the vehicle. Upon pickup, I was given a 'We-Owe' slip which entitled me to the sunroof I purchased.

I scheduled the installation for the following week. On the day of the install, the car was dropped off at 7:30 am. I received a call from the dealership at 3:30pm, informing me that they could not install the sunroof because there was a problem with the paperwork. The paperwork had been settled one week prior! I was told that if I were to re-do the paperwork,

which would be an additional 1K, then they would reschedule to have the sunroof installed. I refused to re-do the paperwork and they refused to install the sunroof.

I was incredibly frustrated by them and took them to Small Claims court, and won. However, I have been unable to collect. The entire situation has been emotinally draining. I am frustrated and angered. I would not like to ever have to purchase a vehicle again after what I've been through. I sent letters to GM, Chevrolet, Nemet, the Better Business Bureau and certain TV stations. No one has been able or has desired to assist me.

It's great that Chantal stood up for her rights and won a judgment against the dealer. For help in collecting, she may have to turn to a commercial collection agency.

36. On or about the 17th day of July, 2002, and continuing to date, the defendant published and disseminated on the website consumeraffairs.com, and, upon information and belief, the defendant participated in the preparation and publication of a false, defamatory, malicious, and libelous article of and concerning the plaintiffs, which article contains inter alia the following matter, to wit:

Rimi of Richmond Hill NY (7/17/02):

The finance person was there to rip us off. Charged and gave us something which we did not need at all, and if we refused he was going to charge us 11% interest when my credit rating is perfect. I got stuck with more Interest rate then what was advertised (Never got the advertised interest rate), got some

kind of security on the car which cost me over $4000 which I
never asked for but was forced to take.

The total value of the car was $14,000 and I wound up paying
over $22,000 for the same car. I was and still am very upset
everytime I think about it. Instead of loving my FIRST
brand-new car I hate it so much can't even stand it. Can't
wait till I get rid of it and will buy a different car but
never Nissan. NEVER AGAIN. I really learned a lot.

37. On or about the 31st day of July, 2002, and continuing to date, the
defendant published and disseminated on the website consumeraffairs.com,
and, upon information and belief, the defendant participated in the
preparation and publication of a false, defamatory, malicious, and
libelous article of and concerning the plaintiffs, which article contains
inter alia the following matter, to wit:

Mordechai of Far Rockaway NY (7/31/02):

I confirmed the financing of the 2001 Nissan Altima for $125
a month for a period of sixty months. I called the sales
person and said straight out that I am not coming in to the
office if it is a penny more than $125. He assured me more
than 5 times over the course of the week that I would only pay
$125 a month aside from the $2000 down payment. He said and I
quote, "I spoke to my manager and he said that we can give you
the 2001 Altima for $125."

I was satisfied with this but to be safe I called again on the
morning of the 29th and said I am only coming in for $125. He
again assured me that I would get exactly that. I came in and

began to fill out all the paperwork. When all the paperwork was filled, we then called the insurance company and got insurance on the car. I then gave him my credit card to bill the first thousand dollars of the $2000 down payment. He did that. We then waited around the dealership for the next hour and a half for the person in charge of the financing to become available. At that point I didn't mind so much, after all I was getting a new car.

When we finally saw the finance guy he asked about how much we wanted to pay for the car. I told him that we were told it would be $125 a month for 60 months. He said that a price like that would be impossible and proceeded to sell us the car for a different price. When I told him about what the salesperson said, he called the salesperson. The salesperson did not deny that he had offered $125.

They called the manager of the dealership and he said that he could not sell me this car for this price and began to offer me other cars, that I was not interested in. I walked out quite upset. I called the manager the next day and he again told that there is absolutely nothing he could do. The salesperson deliberately lied to try and make a sale. He even went as far as calling the insurance company and even took a thousand dollars as down payment.

38. On or about the 25th day of March, 2003, and continuing to date, the defendant published and disseminated on the website consumeraffairs.com,

and, upon information and belief, the defendant participated in the preparation and publication of a false, defamatory, malicious, and libelous article of and concerning the plaintiffs, which article contains inter alia the following matter, to wit:

Nemet - Advertising Claims:

Buying a used car is always tricky business and it's not unusual for cars to be a bit less perfect than one expects. If the car is bought "as-is," there's not much recourse.

However, if a dealer advertisers a car at a certain price, it is obligated to honor that price unless it has clearly disclosed that the price applies only under certain conditions. Does Nemet know this?

Kevin of Palisades Park NJ (3/25/03):

I recently purchased a used 2000 Volkswagen GTi at this dealership. I was sold a car which had manual seats and a worthless, non-working car stereo with a missing amplifier, even though they had "Power Seat" and "AM/FM/Cassette/Stereo" listed as included options on the original window sticker as well as on their own online for-sale ad. Adding to my bad experience at this dealership, the financing manager refused to accept my low interest E-Loan as payment for this vehicle, telling me that they would not sell me the car unless I financed it through their own lender, at a higher interest rate.

Then on another occasion, the sales manager told me I had no claim because the financing contract which I signed would

override anything else, including the Buyer's Guide window sticker. Having done my research, I notified the sales manager that according to the Federal Trade Commission, the window sticker becomes a part of any contract upon purchase of the vehicle and overrides any contrary provisions. He suddenly agreed with me.

A vehicle which they had labeled as being in "EXCELLENT CONDITION" and had been "inspected" and "certified" had a broken glove box door, no power seats when it was advertised as having them, and missing the factory amplifier which would have powered the car stereo, basically making the stereo head unit worthless. This is misleading and false advertising by NEMET Autocenter. There was no way that I could have reasonably known that the stereo was not functional, since at the time of the test drive and purchase of the vehicle, the sales person did not have the security code for it.

I requested that they either refund the cost of what it would take me to replace and repair all of these missing and broken parts, or to provide me with a suitable replacement for them. They offered me $300 in compensation. I wonder how many car dealerships out there would charge as little as $300 for an option package including power seats, car stereo and replacement of a broken glove box door?

39. On or about the 15th day of April, 2003, and continuing to date, the defendant published and disseminated on the website consumeraffairs.com,

and, upon information and belief, the defendant participated in the preparation and publication of a false, defamatory, malicious, and libelous article of and concerning the plaintiffs, which article contains inter alia the following matter, to wit:

Bharat of Baldwin NY writes (4/15/03):

I purchased a certified 2000 Honda Civic from Nemet Nissan of Queens. The initial cost of the car was $9000. It was the last day of May and they rushed me through the sale so they can tend to other customers. I told the finance person that I did not want any extra on the car except for the extended warranty. Not knowing that he slipped a paper in the contract for an replacement program which enrolls me into a VIP program that will allow certain maintenance done on the car at discount prices and in case the car gets stolen they will give me $7500 to put towards a new car purchase.

After leaving the dealer I realized that the salesperson did not give me my receipts for my car so I called and asked that I come back and get my paperwork. They told not to worry about anything that I can come back in the morning and pick it up. When I went back in the morning I was told that the salesman was not in and that I should come back tomorrow. I finally got the paperwork after three days. After sitting down and reading through the paperwork I realized that I was charged for the replacement program. I immediately called the dealer and told the finance person that I was not interested in that program which is going to cost me another $3600 and that he take it

off of my contract, he then told me that it was too late for
him to do anything about it.

They intentionally kept my paperwork away from me so that the
three days that I had to change or reverse the deal passes by.
Now a car that I originally purchased for $9000 is going to
cast me $19,800 and they refused to take off the extra charges
for things that I did not want in the first place.

40. On or about the 12th day of July, 2003, and continuing to date, the
defendant published and disseminated on the website consumeraffairs.com,
and, upon information and belief, the defendant participated in the
preparation and publication of a false, defamatory, malicious, and
libelous article of and concerning the plaintiffs, which article contains
inter alia the following matter, to wit:

Rey of Glendale NY (7/12/03):

I bought a car last June (Maxima 2004) and they offered me an
extended warranty and VIP club member. It came out to $2500
extra beside the $32000 car price. After 2 days I went back to
the dealer to cancel the extended warranty and $1000 for free
lifetime oil change and they don't want to give me my money
back. I went back 3 times and everybody was very nasty,
especially Mr Slotnick, the finance manager. He doesn't want
to talk to me because they got my money from the car. But when
I'm ready to pay the car he's very nice to me.

Before they sold me an extended warranty he show me a long
list of what can I get for extended warranty which is a NISSAN
SECURITY+PLUS. When I got home I read all the papers he gave

me and I thought everything is ok. After few days I call the Nissan company to find out if I'am in the computer list alrady, but they said I'am not a member of Nissan Extended Warranty.

Guess what -- they give me a different company instead of NISSAN company extended warranty. My point is I bought a brand new Maxima 2004, they should give me a Nissan Extended Warranty, not a different company.

41. On or about the 21st day of August, 2003, and continuing to date, the defendant published and disseminated on the website consumeraffairs.com, and, upon information and belief, the defendant participated in the preparation and publication of a false, defamatory, malicious, and libelous article of and concerning the plaintiffs, which article contains inter alia the following matter, to wit:

Steven of Bronx NY (8/21/03):

I went to Nemet Motors on May 5, 2002 and purchased a car. I paid down $9,900 and was told that the car valued at $14,000, which would leave a balance of $4,100 to be paid. The saleman, Mr. DJ Williams, told me I could finance the remaining balance which would add up to $10,000 and I would pay about $19,900 in full.

They claimed that I financed $10,350.85 and I had to pay $6,276.35 for finance charge. So, the total I have to pay is $26,527.20. I would never had signed the contract if I had known that it would cost $26,527.20 and now I can't pay the finance charge.

42. On or about the 24th day of August, 2003, and continuing to date, the defendant published and disseminated on the website consumeraffairs.com, and, upon information and belief, the defendant participated in the preparation and publication of a false, defamatory, malicious, and libelous article of and concerning the plaintiffs, which article contains inter alia the following matter, to wit:

Daniel of Brooklyn (8/24/03):

As per my new car purchase, Nemet Nissan was to take in my Mitsubishi Montero as a lease return. Although they don't sell Mitsu's, they told me they could take it in and I could drive out in my new Maxima. They said it was everday practice for all new car dealers. Because the lease buy-out was too high, they would just send the car to a Mitsu dealer. They transfered my plates and I was on my way, happy with my brand new car.

All the while, they reassured me everything was fine and I had nothing to worry about. Thank God they gave me a signed "Odometer Statement" for the vehicle or I would not be able to do anything. They ended up keeping the car on their lot for three months. It wasn't long before Mitsu started sending me letters and bills. I contacted numerous people at Nemet and spoke with them dozens of times. Each time I either got the run-around or was told not to worry because it was now their problem and the "Odometer Statement" relieved me of any financial charges. Luckily, I kept records of each phone call. Needless to say, Mitsu wasn't interested in our dispute. They

wanted their car and 3 month's of charges. Mitsu ended up
hiring a repo agent to go and recover the car because Nemet
would not bring it to them. A repo fee and storage fees were
added to my outstanding balance. I eventually had to pay the
$1500.00 to avoid a bad credit report. Nemet never accepted
any responsibility and always told me this was between me and
Mitsu. Only after I paid Mitsu and told Nemet I had planned to
file numerous complaints with various agencies, and take them
to court, they offered me only $200.00. It has now been almost
a year and I have cases and complaints pending against them
with many agencies.

They told me whatever they had to, and made false promises
just to make a sale. After I left with it, they never
concerned themselves with me again. Their irresponsibility
cost me $1530.00 and I want it back.

He's probably already done this but if not, Daniel should also
file against the dealer in Small Claims Court.

43. On or about the 5th day of October, 2003, and continuing to date, the
defendant published and disseminated on the website consumeraffairs.com,
and, upon information and belief, the defendant participated in the
preparation and publication of a false, defamatory, malicious, and
libelous article of and concerning the plaintiffs, which article contains
inter alia the following matter, to wit:

Anthony of Staten Island NY (10/5/03):

I went to inquire about an ad this particular Nissan
dealership ran in the Daily News. I was told several times

over the phone that there wasn't anything else to it and that if I came from Staten Island they would discuss it with me. I made the trip in to then purchase a brand new 2003 Nissan Pathfinder. The sales rep I was dealing with and I had discussed several options. Each time he left to discuss this with the manager on duty.

After a short while we reached an agreement on a deal. He then called my insurance company and switched over my current insurance to a Pathfinder to be in effect the following day. I then gave a deposit. I went home, cleaned out my car for the trade-in and and went to pick up my new car which I was already insured for and given a VIN number.

Upon my arrival to Nemet I was greeted by a manger who had my folder in hand. He then preceeded to tell me that he could not honor the deal. He said he was losing money on it and that he would not be able to give me the car or the deal advertised in the paper. He said that the manager on duty never signed off on it so it wasn't official and also that the sales rep "messed up". In the end I had to leave the dealership with my current car which was no longer insured.

I understand that dealerships have to make a certain percentage but this was a deal made. There were no negotions in the works. I was going there to drive home my brand new car. If there were negotions to be made unbeknownst to me they should not have transfered my insurance over, taken a deposit

or had me make the trip in when it was clear they were aware of this issue. I arrived in late afternoon, as agreed, and prior received no news on the change. In addition, they would not honor the ad which was run in the paper. They told me I should not shop by an ad anyway.

44. On or about the 26th day of November, 2003, and continuing to date, the defendant published and disseminated on the website consumeraffairs.com, and, upon information and belief, the defendant participated in the preparation and publication of a false, defamatory, malicious, and libelous article of and concerning the plaintiffs, which article contains inter alia the following matter, to wit:

Brendan of Floral Park NY (11/26/03):

My experience at this dealership was anything but pleasurable. The agreed upon payment was extremely misrepresented by their sales associate, hours of my time were wasted, and the Customer Service and management of this dealership was deplorable. On Saturday, November 22, 2003, I met with Alicia Campos at Nemet Auto and set-up a test-drive on a 2003 Chevy Trailblazer LT for that Monday.

That Monday after the test-drive, I informed Ms. Campos that I was interested in purchasing the vehicle, however I also told her that I was still shopping around for the best deal. In order to get the ball rolling to see if I would qualify for the Zero percent financing, I filled out a credit application. After spending two hours in the dealership, I was pre-approved for the Zero percent interest loan. It was agreed that evening

that the down payment would total $2000.00. This amount consisted of $500.00 out of pocket expense, $1053.00 GMAC Credit Card Points Incentive and $500.00 Customer Loyalty Credit.

It was further determined that the payment would be $350.00 per month for 72 months. I would also be trading in a 2002 Chevy Impala which still had an outstanding loan balance of $12,600.00. I questioned a payment of $350.00 several times as I realized the incredible deal that I would be getting. The sticker price on the car was $37,000.00 and the total payments would be $27,200.00. I was assured each time that the payment would be $350.00 with $2000.00 down.

Based on this information, I gave the dealership $500.00 towards the down payment and completed the necessary applications. On Tuesday, November 25th all requested information was faxed to the dealership including the insurance information for the new vehicle. I was advised that I could pick the vehicle up later in the evening. I arrived at the dealership at 7 p.m. at which time the Impala was taken for inspection. At 8:30 p.m. I was finally taken to see the Finance Manager, Mr. Hernandez, to complete all necessary paperwork.

Firstly, I was advised that if I wanted to take advantage of the zero percent interest loan I was not entitled to the $500.00 Customer Loyalty Credit as previously told the evening

before (I find this to be pretty ironic). Then to my outrage I was advised that the monthly payment would be $549.00 per month for 72 months. I immediately asked to speak with the Manager of the Dealership and the Sales Associate whom I originally dealt with. In the presence of the Sales Associate and Finance Manger I advised the DealershipÆs Manager of the prior evening's 2 hour discussion, the terms of the agreement made, and the numerous occasions that I verified that the payment would be $350.00 per month for 72 months.

The finance manager stated I seemed like an educated person and I should have realized that the payment could not have been $350.00. Of course I realized that was a fabulous deal, that is why I continued to question the Sales Associate and ultimately agreed to purchase the car. The dealershipÆs Manager, with a smile on his face, then told me to be reasonable and began to try and cut a ôdealö, the lowest payment being $489.00 per month.

I am outraged at the deception that occurred at this dealership and the lack of concern or apology on behalf of management. I left with not even an apology or explanation. I am the manager of a customer service department for one of the largest banks in New York, and I find this to be inexcusable, unacceptable, and extremely disturbing. By the reaction or lack of reaction by the sales associate and management, I am lead to believe that this is a common occurrence at this

dealership. They low ball their price, bring you in to sign the paperwork, and spring a higher payment on you.

45. Upon information and belief, at the time of the aforesaid publications, the defendant was actuated by actual malice in that the defendant published the articles with reckless and wanton disregard of whether they were false and untrue.

46. As a result of the publications and the acts of the defendant in connection therewith, the plaintiffs have been held up to public contempt, ridicule, disgrace, and prejudice; have suffered great mental pain and anguish; and have been irreparable injured in their good name, business reputation, and social standing, and have lost the esteem and respect of their friends, acquaintances, business associates, and of the public generally.

47. That by reason of the foregoing, the plaintiffs have suffered damages in an amount to be determined upon the trial of this action.

## PRAYER FOR RELIEF

**WHEREFORE,** plaintiffs, NEMET CHEVROLET LTD. and THOMAS NEMET, request that this Court:

   a.   Award plaintiffs such monetary relief in an amount to be determined upon the trial of this action, together with the costs and disbursements of this action;

   b.   Award plaintiffs such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of further injury to plaintiffs during the pendency of this action and to preserve the possibility of effective final relief;

   c.   Permanently enjoin defendant from violating section 43(a)of the

Lanham Act, 15 U.S.C. § 1125(a), and New York General Business Law §§ 349(a) and 350, as alleged herein; and

d.  Award all relief that the Court finds necessary to remedy defendant's continuing violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and New York General Business Law §§ 349(a) and 350, including, but not limited to, redress, and disgorgement of defendant's unjust gains.

DATED:  Garden City, New York
October 24, 2006

Yours, etc.

BRAND, GLICK & BRAND, P.C.
Attorneys for Plaintiff

BY: Carolyn S. Rankin, Esq.
600 Old Country Road, Suite 440
Garden City, New York 11530
(516) 746-3500